# EXHIBIT

## "A"

button [29] and Cabrol modifications [31] of the original Bentall procedure [24], and ensures the safe repair and reinforcement of even the most seriously dissected coronary orifices. It has been very helpful in achieving a strikingly low operative mortality with radical root replacement in acute dissections. The overall results of the button modification of the Bentall procedure in this series of patients compares very favorably with results obtained with alternative techniques, including valve-sparing replacement and pulmonary autografts, with durable long-term results. Event-free survival was 79.1% ± 3% at 5 years and 62.3% ± 7% at 8 years. There were significantly fewer late reoperations and deaths related to the aorta or the repair in this group compared with patients who had repairs other than the button modifications of the Bentall procedure. Cardiac and distal aorta-related events account for most cases of long-term attrition (Figure 2).

## Conclusions

Currently available surgical techniques yield good immediate and long-term results with minimal risk in elective operations on the ascending aorta and aortic root. The mortality of emergency operation still remains high. The occurrence of dissection adversely affects long-term outlook. In light of surgical advances, the previously accepted indications for elective replacement of the dilated ascending aorta may be too conservative, and a revision is needed toward more liberal indications in order to prevent lethal complications and emergency operations. New data from detailed natural history studies will undoubtedly help in refining operative guidelines. Appropriate choice of surgical procedure results in excellent long-term results, but cardiac and distal aorta-related events ultimately determine survival.

## References

1. Gillum RF. Epidemiology of aortic aneurysm in the United States. J Clin Epidemiol 1995;48:1289-98.
2. Ergin MA, McCullough J, Galla JD, et al. Radical replacement of the aortic root in acute type A dissection: indications and outcome. Eur J Cardiothorac Surg 1996;10:840-5.
3. Vilacosta I, San Roman JA, Ferreiros J, et al. Natural history and serial morphology of aortic intramural hematoma: a novel variant of aortic dissection. Am Heart J 1997;134:495-507.
4. Ergin MA, Raissi S, Follis F, et al. Annular destruction in acute bacterial endocarditis. Surgical techniques to meet the challenge. J Thorac Cardiovasc Surg 1989;97:755-63.
5. Gott VL, Cameron DE, Reitz BA, Pyeritz RE. Current diagnosis and prescription for the Marfan syndrome: aortic root and valve replacement. J Card Surg 1994;9(Suppl 2):177-81.
6. Marsalese DL, Moodie DS, Lytle BW, et al. Cystic medial necrosis of the aorta in patients without Marfan's syndrome: surgical outcome and long-term follow-up. J Am Coll Cardiol 1990;16:68-73.
7. Braverman AC. Bicuspid aortic valve and associated aortic wall abnormalities [editorial]. Curr Opin Cardiol 1996;11:501-3.
8. Kouchoukos NT, Wareing TH, Daily BB, Murphy SF. Management of the severely atherosclerotic aorta during cardiac operations. J Card Surg 1994;9:490-4.
9. Davila-Roman VG, Phillips KJ, Daily BB, et al. Intraoperative transesophageal echocardiography and epiaortic ultrasound for assessment of atherosclerosis of the thoracic aorta. J Am Coll Cardiol 1996;28:942-7.
10. Roman MJ, Devereux RB, Kramer-Fox R, O'Loughlin J. Two-dimensional echocardiographic aortic root dimensions in normal children and adults. Am J Cardiol 1989;64:507-12.
11. Schlatmann TJM, Becker AE. Histologic changes in the normal aging aorta: implications for dissecting aneurysm. Am J Cardiol 1977;39:13-20.
12. Pearce WH, Slaughter MS, LeMaire S, et al. Aortic diameter as a function of age, gender, and body surface area. Surgery 1993;114:691-7.
13. Johnston KW, Rutherford R, Tilson MD, et al. Suggested standards for reporting on arterial aneurysms. Subcommittee on Reporting Standards for Arterial Aneurysms, Ad Hoc Committee on Reporting Standards, Society for Vascular Surgery and North American Chapter, International Society for Cardiovascular Surgery. J Vasc Surg 1991;13:452-8.
14. Rozendaal L, Groenink M, Naeff MS, et al. Marfan syndrome in children and adolescents: an adjusted nomogram for screening aortic root dilatation. Heart 1998;79:69-72.
15. Olson LJ, Subramanian R, Edwards WD. Surgical pathology of pure aortic insufficiency: a study of 225 cases. Mayo Clin Proc 1984;59:835-41.
16. Pachulski RT, Weinberg AL, Chan KL. Aortic aneurysm in patients with functionally normal or minimally stenotic bicuspid aortic valve. Am J Cardiol 1991;67:781-2.
17. Huntington K, Hunter AG, Chan KL. A prospective study to assess the frequency of familial clustering of congenital bicuspid aortic valve. J Am Coll Cardiol 1997;30:1809-12.
18. Coady MA, Rizzo JA, Hammond GL, et al. What is the appropriate size criterion for resection of thoracic aortic aneurysms? J Thorac Cardiovasc Surg 1997;113:476-91.
19. Epperlein S, Mohr-Kahaly S, Erbel R, et al. Aorta and aortic valve morphologies predisposing to aortic dissection. An in vivo assessment with transoesophageal echocardiography. Eur Heart J 1994;15:1520-7.
20. Child AH. Marfan syndrome—current medical and genetic knowledge: how to treat and when. J Card Surg 1997;12 (Suppl 2):131-6.
21. Legget ME, Unger TA, O'Sullivan CK, et al. Aortic root complications in Marfan's syndrome: identification of a lower risk group. Heart 1996;75:389-95.
22. Perko MJ, Norgaard M, Herzog TM, et al. Unoperated aortic aneurysm: a survey of 170 patients. Ann Thorac Surg 1995;59:1204-9.
23. Dapunt OE, Galla JD, Sadeghi AM, et al. The natural history of thoracic aortic aneurysms. J Thorac Cardiovasc Surg 1994;107:1323-32.
24. Bentall H, DeBono A. A technique for complete replacement of the ascending aorta. Thorax 1968;23:338-9.
25. Ross D. Replacement of the aortic valve with a pulmonary autograft: the "switch" operation. Ann Thorac Surg 1991;52:1346-50.
26. Sarsam MA, Yacoub M. Remodeling of the aortic valve annulus. J Thorac Cardiovasc Surg 1993;105:435-8.
27. Carrel T, von Segesser L, Jenni R, et al. Dealing with dilated ascending aorta during aortic valve replacement: advantages of conservative surgical approach. Eur J Cardiothorac Surg 1991;5:137-43.
28. Yun KL, Miller DC, Fann JL, et al. Composite valve graft versus separate aortic valve and ascending aortic replacement: is there still a role for the separate procedure. Circulation 1997;96(Suppl 1):368-75.
29. Kouchoukos NT, Marshall WG, Jr, Wedige-Stecher TA. Eleven-year experience with composite graft replacement of the ascending aorta and aortic valve. J Thorac Cardiovasc Surg 1986;92:691-705.
30. David TE. Current practice in Marfan's aortic root surgery: reconstruction with aortic valve preservation or replacement? What to do with the mitral valve? J Card Surg 1997;12 (Suppl 2):147-50.
31. Cabrol C, Pavie A, Mesnildrey P, et al. Long-term results with total replacement of the ascending aorta and reimplantation of the coronary arteries. J Thorac Cardiovasc Surg 1986;91:17-25.
32. Prenger K, Pieters I, Cheriex E. Aortic dissection after aortic valve replacement: incidence and consequences for strategy. J Card Surg 1994;9:495-8.

**SESSION 1: ASCENDING AORTA**

# Surgical Treatment of the Dilated Ascending Aorta: When and How?

M. Arisan Ergin, MD, PhD, David Spielvogel, MD, Anil Apaydin, MD,
Steven L. Lansman, MD, PhD, Jock N. McCullough, MD, Jan D. Galla, MD, PhD, and
Randall B. Griepp, MD

Department of Cardiothoracic Surgery, Mount Sinai Medical Center, New York, New York

*Background.* The aorta is considered pathologically dilated if the diameters of the ascending aorta and the aortic root exceed the norms for a given age and body size. A 50% increase over the normal diameter is considered aneurysmal dilatation. Such dilatation of the ascending aorta frequently leads to significant aortic valvular insufficiency, even in the presence of an otherwise normal valve. The dilated or aneurysmal ascending aorta is at risk for spontaneous rupture or dissection. The magnitude of this risk is closely related to the size of the aorta and the underlying pathology of the aortic wall. The occurrence of rupture or dissection adversely alters natural history and survival even after successful emergency surgical treatment.

*Methods.* In recommending elective surgery for the dilated ascending aorta, the patient's age, the relative size of the aorta, the structure and function of the aortic valve, and the pathology of the aortic wall have to be considered. The indications for replacement of the ascending aorta in patients with Marfan's syndrome, acute dissection, intramural hematoma, and endocarditis with annular destruction are supported by solid clinical information. Surgical guidelines for intervening in degenerative dilatation of the ascending aorta, however, especially when its discovery is incidental to other cardiac operations, remain mostly empiric because of lack of natural history studies. The association of a bicuspid aortic valve with ascending aortic dilatation requires special attention.

*Results.* There are a number of current techniques for surgical restoration of the functional and anatomical integrity of the aortic root. The choice of procedure is influenced by careful consideration of multiple factors, such as the patient's age and anticipated survival time; underlying aortic pathology; anatomical considerations related to the aortic valve leaflets, annulus, sinuses, and the sino-tubular ridge; the condition of the distal aorta; the likelihood of future distal operation; the risk of anticoagulation; and, of course, the surgeon's experience with the technique. Currently, elective root replacement with an appropriately chosen technique should not carry an operative risk much higher than that of routine aortic valve replacement. Composite replacement of the aortic valve and the ascending aorta, as originally described by Bentall, DeBono and Edwards (classic Bentall), or modified by Kouchoukos (button Bentall), remains the most versatile and widely applied method. Since 1989, the button modification of the Bentall procedure has been used in 250 patients at Mount Sinai Medical Center, with a hospital mortality of 4% and excellent long-term survival. In this group, age was the only predictor of operative risk (age > 60 years, mortality 7.3% [9/124] compared with age < 60, mortality 0.8% [1/126], $p = 0.02$).

*Conclusions.* This modification of the Bentall procedure has set a standard for evaluating the more recently introduced methods of aortic root repair.

(Ann Thorac Surg 1999;67:1834–9)
© 1999 by The Society of Thoracic Surgeons

Replacement of the ascending aorta is the most frequently performed procedure for thoracic aortic pathology [1]. Current indications for replacement of the ascending aorta and aortic root may be divided into two broad categories.

## Mandatory Indications

These are usually urgent situations involving acute dissection of the ascending aorta and related pathology,

spontaneous rupture [2], and intramural hematoma [3]. The value of replacing the entire aortic root for severe destruction of the aortic annulus due to bacterial endocarditis is also well established [4]. Solid clinical experience and information support these indications.

## Elective Indications

These are relative indications, since these operations are generally prophylactic in nature, aiming to prevent progression of aortic insufficiency and rupture or dissection of the aorta: in Marfan's syndrome related pathology, in the presence of degenerative dilatation of the ascending aorta [6] with or without a bicuspid aortic valve [7], and in chronic dissection of the ascending aorta. Severe athero-

Presented at the Aortic Surgery Symposium VI, April 30–May 1, 1998, New York, NY.

Address reprint requests to Dr Ergin, Department of Cardiothoracic Surgery, Mount Sinai Medical Center, Box 1028, One Gustave L. Levy Place, New York, NY, 10029.

0003-4975/99/$20.00
PII S0003-4975(99)00439-7

Ann Thorac Surg
1999;67:1834–9

sclerosis of the ascending aorta (with mobile plaque causing embolization, or discovered during unrelated cardiac surgery) is an emerging indication for elective replacement of the ascending aorta [8, 9]. The decision to operate in these cases is frequently not simple: there is a substantial gray area that changes with the times, greatly influenced by the introduction of new, safe, and effective surgical techniques. The following is a brief review of the current indications for replacement of the ascending aorta, the timing of the operation, and the choice of surgical technique.

## Definition

Echocardiography in general, and especially transesophageal echocardiography, remains the main source of information for definition of a norm for ascending aortic size. The normal diameter of the ascending aorta, aortic sinuses, and the aortic annulus correlates with body size and age in both men and women [10]. Body size is the predominant determinant of aortic annular and sinus of Valsalva dimensions, whereas age is a more important determinant of the size of the sino-tubular junction and the ascending aorta proper [10]. The effect of age on the dimension of the ascending aorta is thought to be the result of age-related fragmentation and loss of elastin in the media, leading to overall weakening of the aortic wall [11]. Smoking accelerates the elastin depletion of the aging aorta by increasing the levels of circulating elastolytic enzymes [12]. The dimension of the aortic root in the normal population shows substantial variability. Predicted dimensions at the level of the sinuses can be calculated by the use of the regression formula described by Roman and associates [10]: for an individual 18–40 years of age, average sinus dimension (cm) = 0.97 + (1.12 × BSA [m²]). Similar formulas exist for children and for adults over the age of 40. The use of nomograms for individuals increases the sensitivity of determination of the presence of aortic dilatation by enabling comparison of predicted values with actual measured dimensions. Specificity of 98% is attained by the use of an upper normal limit of 2.1 cm/m² for the aortic diameter at the sinuses [10]. The aorta is pathologically dilated if the diameter exceeds the norm for a given age and body size. An aneurysm is defined as a 50% increase over the normal diameter [13]. Use of an adjusted nomogram for Marfan patients has been suggested in order to compensate for their relatively tall stature [14].

## Pathologic and Clinical Consequences of a Dilated Ascending Aorta

Since there are several important physiologic and pathological consequences of a dilated ascending aorta, the size of the ascending aorta remains the most important component of the equation that leads to a decision to replace the ascending aorta on an elective basis. Dilatation of the ascending aorta is currently the most common cause of isolated aortic valvular regurgitation [15]. A normal aortic valve becomes incompetent as a result of

the passive stretching of its leaflets and commissures due to dilatation of the sino-tubular ridge, the ascending aorta, or the sinuses, although the aortic annulus often remains normal in size.

There is a clear relationship between a dilated ascending aorta and a bicuspid aortic valve, even in the absence of significant hemodynamic dysfunction of the valve. This association has been linked to related abnormalities of the aortic wall [16]. A familial clustering of bicuspid valves was described recently, suggesting a possible genetic connection [17], which in turn raises the question of routine screening for siblings of patients with bicuspid aortic valves. The use of adrenergic beta-blocker therapy to retard continued expansion in such individuals with borderline dilatation of the ascending aorta remains an open question [7]. A growing knowledge of the close relationship between a bicuspid valve and a dilated ascending aorta sometimes represents a particular dilemma for the operating surgeon. The most important consequence of an enlarged ascending aortic dimension is the proportional increase in its incidence of rupture, dissection, and reoperation, the latter especially after valve replacement for a bicuspid valve.

There remains a considerable void in our knowledge of the natural history of ascending aortic dilatation. Although there is solid information available in Marfan's syndrome, such data are lacking for other pathologies. Therefore, in the absence of a better measure, some data are routinely transposed from the far better documented natural history of the descending aorta. With this caveat in mind, there are three clues that connect increasing size of the ascending aorta to the incidence of rupture or dissection:

1. An ascending aortic diameter of 6 cm emerges as the mean or the median diameter quite consistently in all reliable contemporary natural history studies. Coady and associates found that a diameter of 6 cm is the "hinge point," beyond which there is a 30% increase in the probability of rupture [18].
2. The measured diameter of the aorta at the time of acute dissection in all series is significantly larger than the norm. Epperlein and colleagues reported a mean aortic root diameter of 3.2 cm/m² in DeBakey type I dissection [19]. Similarly, in our experience with more than 140 acute type A dissections, the ascending aorta was dilated at the time of presentation in 73%, with a mean diameter of 4.8 cm.
3. The incidence of postoperative dissection is significantly higher if the aorta is 5 cm or larger at the time of aortic valve replacement. Prenger and associates [32] reported an incidence of 27% if the aorta was 5 cm or larger, as opposed to a 0.6% incidence of postoperative dissection if aortic size was normal. This is a strong argument in favor of dealing with a dilated aorta at the time of valve replacement in order to prevent postoperative dissection.

After size, pathology is the second most important determinant of the risk of rupture or dissection in a

dilated ascending aorta. The condition of the aortic wall corresponds to the factor of wall thickness in Laplace's law. The Marfan aorta, which provides a good example of a weakened aortic wall, it is known to rupture at comparatively smaller diameters, especially in patients with a strong family history of premature rupture or dissection, and in some types of de novo mutations with overt skeletal manifestations of the disease [20]. Recently, Legget and colleagues showed that in Marfan's syndrome, an initial aortic ratio (measured diameter/predicted diameter) at the sinuses of 1.3 increased the relative risk of rupture, dissection, or operation for enlarged diameter by 2.7, and a > 5% annual increase in the aortic ratio increased these risks by a factor of 4.1. They suggest that patients with dimensions smaller than these parameters could be observed with some degree of comfort [21].

Like Marfan syndrome, dissection of the aorta involves a grossly weakened aortic wall, and predictably increases the frequency of rupture. In the unoperated series of patients reported by Perko and associates, 75% of chronic dissections ruptured within 5 years, whereas only 45% of nondissected aortas ruptured during the same interval [22]. Similarly, as expected, a weakened aortic wall shows an increased rate of expansion. The rate of expansion for dissections was reported to be about double that of the nondissected aorta by Coady and associates [18]. The rate of expansion has been shown to be an important predictor of rupture [23].

## Current Recommendations: The Rationale for Elective Resection

There is very little doubt that the occurrence of rupture or dissection is a catastrophic event that changes the natural history of a dilated ascending aorta dramatically. Rupture uniformly, and dissection in the vast majority of the patients, is final without urgent surgical treatment, which carries a substantially higher risk than elective surgery. Even if the patient survives the acute incident as the result of a successful operation or proceeds into the chronic phase of the dissection, he or she will remain at a higher risk for distal aorta-related complications, which are the most important determinants of long-term survival in most cases.

Current recommendations for elective resection of the ascending aorta are based on the fact that the mean diameter of the aorta at the time of dissection or rupture is around 6 cm, but this actually means that half of the patients will already have experienced one of these highly lethal complications by the time a diameter of 6 cm is reached. Recommending surgery at a diameter of 6 cm may have been appropriate in an era when the surgical mortality for elective operation of the ascending aorta was relatively high. Today, in light of a markedly reduced risk of elective surgery, it seems excessively conservative. Strict adherence to this guideline from another era undoubtedly leads to missing the opportunity for elective surgery to prevent lethal complications in this substantial number of patients with a dilated ascending aorta. The fate of the aortic valve also emerges as an important consideration favoring earlier operation. The success

of a valve-sparing replacement of the aortic root depends to a great extent on the degree of preoperative aortic insufficiency and the distortion of the geometry of the aortic root caused by long-standing enlargement of the aorta. The probability of a satisfactory valve repair declines progressively as the size of the aortic root increases. So it is reasonable to expect a better and more durable repair if only moderate dilatation and modest increases are present, as opposed to marked dilatation and severe aortic regurgitation. These two consideration bring to mind arguments for earlier repair of mitral regurgitation. Why should one wait until long-term survival is substantially reduced in 50% of the patients due to an irreparably damaged ventricle if a repair can be done with minimal risk to the patient? Similarly, why wait to operate on the aortic root until half the patients are exposed to the risk of a lethal complication, given that the ascending aorta can be replaced with only a small surgical risk as well as a better chance of sparing the aortic valve if operation is undertaken earlier?

The data emerging on Marfan patients also point out the fallacy of applying an absolute size criterion to all patients. One should be thinking more in terms of ratios or aortic indices rather than absolute sizes. A ratio of 1.3 in a 2-m² adult of age < 40 years translates to a diameter of 4.2 cm, a dimension much smaller than the commonly recommended size of 5 cm for elective resection in Marfan's. These data show us that the risk of rupture or dissection is far from negligible at much smaller aortic sizes than those traditionally used as indications for operation [21].

Based on these considerations, the best current recommendations for timely intervention in a dilated ascending aorta can be summarized. There is a spectrum of conditions, represented at one extreme by the Marfan patient with a positive family history of premature rupture or dissection (ratio 1.3, or a diameter of 4.3 cm for an average 2-m² adult < 40 years of age), and at the other extreme, by a patient of the same size with a dilated aorta due to medial degeneration without significant aortic regurgitation, or one whose dilatation is discovered during unrelated routine cardiac surgery (ratio 1.5, or diameter 4.8–5 cm). Indications for chronic dissections should be considered akin to those for Marfan syndromes because of the shared factor of a weakened aortic wall. Patients with a bicuspid aortic valve fall between these two extremes, generally. If operation is indicated primarily for a dysfunctional valve, it is probably prudent to proceed with definitive treatment of the ascending aorta if the ratio exceeds 1.4 (diameter 4.5 cm) at the time of valve replacement. Again, the factor that prompts earlier valve replacement in these cases is the associated inherent weakness of the aortic wall.

In patients with medial degeneration and secondary aortic regurgitation, the degree of insufficiency may dictate earlier operation regardless of aortic size. Delaying definitive treatment in these cases not only will jeopardize long-term outcome due to deterioration of left ventricular function, but also may reduce the probability of being able to spare the aortic valve. Of course, the

Ann Thorac Surg 1999;67:1834-9

Ann Thorac Surg
1999;67:1834-9

Table 1. Current Guidelines for Surgery

| Adult Age < 40 years BSA 2 m² | Diameter | Ratio |
|---|---|---|
| Marfan's (+family history) | > 4.3 | 1.3 |
| Chronic dissections | > 4.3 | 1.3 |
| Degenerative without AI | > 4.8 | 1.5 |
| Degenerative with AI (degreel) | > 4.8 | 1.5 |
| Bicuspid valve with dysfunction | > 4.5 | 1.4 |
| Other cardiac surgery | > 4.8 | 1.5 |
| Surgeons' experience | +0.5 | 0.15 |

AI = aortic insufficiency.

experience of the surgeon with aortic root replacement has to be taken into account in recommending relatively early operation to an otherwise asymptomatic patient. We therefore would suggest adding 0.15 to the ratio or 0.5 cm to the diameter to account for this factor in different hands. This would bring these recommendations more in line with some of the more aggressive traditional criteria (Table 1). Adherence to these guidelines will not eliminate the occurrence of rupture or dissection, but would be expected to halve the incidence of lethal complications and prevent substantial numbers of emergency operations.

## Choice of Procedure

Currently, there are a variety of operative techniques available for surgical treatment of a dilated ascending aorta. These represent a large spectrum, ranging from separate replacement of the aortic valve and ascending aorta to the most widely applied and versatile technique of composite root replacement with one of the three principal modifications of the technique originally described by Bentall and DeBono [24], and also include the more recently introduced techniques of pulmonary autograft [25] and valve-sparing root replacement [26]. Among these alternatives, the often neglected but time-tested method of aortic root wrapping is worth mentioning. It has the advantage of simplicity, and more importantly, preserves the endothelial lining of the ascending aorta. There is evidence to suggest that, when done properly, wrapping is a good compromise in older patients with a borderline dilated aorta, especially during operations for other cardiac pathology [27]. Choosing the technique appropriate for the particular patient and pathology requires careful consideration of many factors, including the surgeon's experience with the particular method. Among these factors are:

1. Age and expected survival. In an older, high-risk patient, simple valve replacement and wrapping of the aorta may be a good compromise solution [27]. Similarly, separate valve and ascending aortic replacement may be appropriate therapy if life expectancy is limited [28].

2. Underlying pathology and quality of the aortic wall. A weakened aortic wall in Marfan syndrome or dissection will require complete excision of the dilated portion of the aorta and the root. The button

modification of the Bentall procedure has proven in our hands the most versatile and durable reconstruction [29]. Sparing the aortic valve in Marfan syndrome is controversial [30].

3. Anatomic condition of the aortic valve, the sinuses, and the sino-tubular ridge. The anatomic condition of the important elements of aortic valvular integrity usually dictate whether the valve can be spared or whether a separate valve-ascending aortic replacement may be feasible. In our experience, the ideal candidate for a valve-sparing root replacement is a patient with a normal valve and annulus in whom a dilated sino-tubular ridge or sinuses lead to aortic insufficiency. A separate valve and ascending aorta replacement that leaves behind portions of dilated sinuses is a compromise that should be avoided in patients with a relatively long life expectancy [28].

4. Condition of the distal aorta. If the condition of the distal aorta mandates future operation for associated distal arch or descending aneurysm or dissection, then a fail-safe initial repair at the root is of paramount importance. The presence of even modest degrees of aortic regurgitation may substantially complicate an operation on the distal aorta, which frequently requires the utilization of hypothermic circulatory arrest. In these cases, we would prefer a composite replacement rather than a valve-sparing procedure.

5. The risk of anticoagulation. Considerations of long-term anticoagulation risk weigh heavily in favor of a valve-sparing operation if feasible, a pulmonary autograft, or use of a composite graft with a tissue valve.

6. Presence of active annular infection. Although there is little evidence in the literature to support it, many surgeons believe an allograft may be preferable for root replacement in this situation.

Table 2 summarizes our current preferences for various kinds of pathology.

## Clinical Experience

Between January 1988 and February 1998, a total of 497 patients underwent operations at Mount Sinai Medical

Table 2. Surgical Options

| Valve | Annulus | Sin/ST-Rdg | Procedure |
|---|---|---|---|
| +++ (old) | N | N | Aorta + valve, wrap (?)ᵃ |
| +++ (young) | N | N | Bentall, pulmonary autograft (?) |
| N | N | +++ | Valve-sparing |
| N | +++ | +++ | Bentall, valve-sparing (?) |
| N (Marfan) | +++ | +++ | Bentall |
| N (Marfan) | N | +++ | Bentall, valve-sparing (?) |
| Infected | N | N | Bentall with-without allograft |

ᵃ (?) = secondary choice.

N = normal;   +++ = severe pathology autograft.

Fig 1. The distribution of procedures on the ascending aorta and the aortic root. Procedure-associated mortality and average age of the patients are shown.



Center on the aortic root, the ascending aorta, and the proximal portion of the aortic arch exclusive of total arch replacement. The indications for surgery in these cases were in accord with the clinical philosophy outlined above. Dissections, both acute and chronic, and degenerative dilatation of the ascending aorta accounted for about 60% of the cases.

The overall hospital mortality was 8% (40/497). Mortality was significantly higher in urgent operations (12.3%, 23/187) than in elective surgery (5.5%, 17/310); $p = 0.05$ [chi square]) and in patients older than 60 years (12.1%, 34/281) compared with those younger than 60 (2.8%, 6/216; $p = 0.01$ [chi square]). Interestingly enough, the presence of acute dissection did not significantly influence operative mortality (12.2%, 15/123, vs 9.9%, 10/101).

Composite replacement of the aortic valve and the ascending aorta, with one of the three principal modifications of the Bentall procedure, was the most common surgical method, used in 311 patients. The proportions of the various surgical options and their associated mortality with respect to age are shown in Figure 1. The button modification of the Bentall procedure was used in 250 patients, with a 4% overall hospital mortality (10/250). Again, age was the only significant factor influencing operative risk. Mortality in patients older than 60 years was 7.3% (9/124) compared with 0.8% (1/126) in patients younger than 60 ($p = 0.02$ [chi square]). Urgency of operation and/or presence of acute dissection did not increase mortality significantly. A hybrid technique in which the coronary orifices are dissected out as buttons surrounded by aortic tissue before end-to-end anastomosis to the Cabrol graft [2] combines the principles of the

Fig 2. Comparative actuarial survival curves for patients after the button modification of the Bentall procedure and other types of repair. The distribution of cardiac and aorta-related events is shown.



Ann Thorac Surg
1997;57:1834-9

ERGIN ET AL    1839
ASCENDING AORTA INDICATIONS, SURGERY

button [29] and Cabrol modifications [31] of the original Bentall procedure [24], and ensures the safe repair and reinforcement of even the most seriously dissected coronary orifices. It has been very helpful in achieving a strikingly low operative mortality with radical root replacement in acute dissections. The overall results of the button modification of the Bentall procedure in this series of patients compares very favorably with results obtained with alternative techniques, including valve-sparing replacement and pulmonary autografts, with durable long-term results. Event-free survival was 79.1% ± 3% at 5 years and 62.3% ± 7% at 8 years. There were significantly fewer late reoperations and deaths related to the aorta or the repair in this group compared with patients who had repairs other than the button modifications of the Bentall procedure. Cardiac and distal aorta-related events account for most cases of long-term attrition (Figure 2).

## Conclusions

Currently available surgical techniques yield good immediate and long-term results with minimal risk in elective operations on the ascending aorta and aortic root. The mortality of emergency operation still remains high. The occurrence of dissection adversely affects long-term outlook. In light of surgical advances, the previously accepted indications for elective replacement of the dilated ascending aorta may be too conservative, and a revision is needed toward more liberal indications in order to prevent lethal complications and emergency operations. New data from detailed natural history studies will undoubtedly help in refining operative guidelines. Appropriate choice of surgical procedure results in excellent long-term results, but cardiac and distal aorta-related events ultimately determine survival.

## References

1. Gillum RF. Epidemiology of aortic aneurysm in the United States. J Clin Epidemiol 1995;48:1289-98.
2. Ergin MA, McCullough J, Galla JD, et al. Radical replacement of the aortic root in acute type A dissection: indications and outcome. Eur J Cardiothorac Surg 1996;10:840-5.
3. Vilacosta I, San Roman JA, Ferreiros J, et al. Natural history and serial morphology of aortic intramural hematoma: a novel variant of aortic dissection. Am Heart J 1997;134:495-507.
4. Ergin MA, Raissi S, Follis F, et al. Annular destruction in acute bacterial endocarditis. Surgical techniques to meet the challenge. J Thorac Cardiovasc Surg 1989;97:755-63.
5. Gott VL, Cameron DE, Reitz BA, Pyeritz RE. Current diagnosis and prescription for the Marfan syndrome: aortic root and valve replacement. J Card Surg 1994;9(Suppl 2):177-81.
6. Marsalese DL, Moodie DS, Lytle BW, et al. Cystic medial necrosis of the aorta in patients without Marfan's syndrome: surgical outcome and long-term follow-up. J Am Coll Cardiol 1990;16:68-73.
7. Braverman AC. Bicuspid aortic valve and associated aortic wall abnormalities [editorial]. Curr Opin Cardiol 1996;11: 501-3.
8. Kouchoukos NT, Wareing TH, Daily BB, Murphy SF. Management of the severely atherosclerotic aorta during cardiac operations. J Card Surg 1994;9:490-4.
9. Davila-Roman VG, Phillips KJ, Daily BB, et al. Intraoperative transesophageal echocardiography and epiaortic ultrasound

for assessment of atherosclerosis of the thoracic aorta. J Am Coll Cardiol 1996;28:942-7.
10. Roman MJ, Devereux RB, Kramer-Fox R, O'Loughlin J. Two-dimensional echocardiographic aortic root dimensions in normal children and adults. Am J Cardiol 1989;64:507-12.
11. Schlatmann TJM, Becker AE. Histologic changes in the normal aging aorta: implications for dissecting aneurysm. Am J Cardiol 1977;39:13-20.
12. Pearce WH, Slaughter MS, LeMaire S, et al. Aortic diameter as a function of age, gender, and body surface area. Surgery 1993;114:691-7.
13. Johnston KW, Rutherford R, Tilson MD, et al. Suggested standards for reporting on arterial aneurysms. Subcommittee on Reporting Standards for Arterial Aneurysms, Ad Hoc Committee on Reporting Standards, Society for Vascular Surgery and North American Chapter, International Society for Cardiovascular Surgery. J Vasc Surg 1991;13:452-8.
14. Rozendaal L, Groenink M, Naeff MS, et al. Marfan syndrome in children and adolescents: an adjusted nomogram for exceeding aortic root dilatation. Heart 1998;79:69-72.
15. Olson LJ, Subramanian R, Edwards WD. Surgical pathology of pure aortic insufficiency: a study of 225 cases. Mayo Clin Proc 1984;59:835-41.
16. Pachulski RT, Weinberg AL, Chan KL. Aortic aneurysm in patients with functionally normal or minimally stenotic bicuspid aortic valve. Am J Cardiol 1991;67:781-2.
17. Huntington K, Hunter AG, Chan KL. A prospective study to assess the frequency of familial clustering of congenital bicuspid aortic valve. J Am Coll Cardiol 1997;30:1809-12.
18. Coady MA, Rizzo JA, Hammond GL, et al. What is the appropriate size criterion for resection of thoracic aortic aneurysms? J Thorac Cardiovasc Surg 1997;113:476-91.
19. Epperlein S, Mohr-Kahaly S, Erbel R, et al. Aorta and aortic valve morphologies predisposing to aortic dissection. An in vivo assessment with transoesophageal echocardiography. Eur Heart J 1994;15:1520-7.
20. Child AH. Marfan syndrome—current medical and genetic knowledge: how to treat and when. J Card Surg 1997;12 (Suppl 2):131-6.
21. Legget ME, Unger TA, O'Sullivan CK, et al. Aortic root complications in Marfan's syndrome: identification of a lower risk group. Heart 1996;75:389-95.
22. Perko MJ, Norgaard M, Herzog TM, et al. Unoperated aortic aneurysm: a survey of 170 patients. Ann Thorac Surg 1995; 59:1204-9.
23. Dapunt OE, Galla JD, Sadeghi AM, et al. The natural history of thoracic aortic aneurysms. J Thorac Cardiovasc Surg 1994; 107:1323-32.
24. Bentall H, DeBono A. A technique for complete replacement of the ascending aorta. Thorax 1968;23:338-9.
25. Ross D. Replacement of the aortic valve with a pulmonary autograft: the "switch" operation. Ann Thorac Surg 1991;52: 1346-50.
26. Sarsam MA, Yacoub M. Remodeling of the aortic valve annulus. J Thorac Cardiovasc Surg 1993;105:435-8.
27. Carrel T, von Segesser L, Jenni R, et al. Dealing with dilated ascending aorta during aortic valve replacement: advantages of conservative surgical approach. Eur J Cardiothorac Surg 1991;5:137-43.
28. Yun KL, Miller DC, Fann JI, et al. Composite valve graft versus separate aortic valve and ascending aortic replacement: is there still a role for the separate procedure. Circulation 1997;96(Suppl 1):368-75.
29. Kouchoukos NT, Marshall WG, Jr, Wedige-Stecher TA. Eleven-year experience with composite graft replacement of the ascending aorta and aortic valve. J Thorac Cardiovasc Surg 1986;92:691-705.
30. David TE. Current practice in Marfan's aortic root surgery: reconstruction with aortic valve preservation or replacement? What to do with the mitral valve? J Card Surg 1997;12 (Suppl 2):147-50.
31. Cabrol C, Pavie A, Mesnildrey P, et al. Long-term results with total replacement of the ascending aorta and reimplantation of the coronary arteries. J Thorac Cardiovasc Surg 1986;91:17-25.
32. Praeger K, Pieters I, Cheriex E. Aortic dissection after aortic valve replacement: incidence and consequences for strategy. J Card Surg 1994;9:495-8.



**DEPARTMENT OF VETERANS AFFAIRS**
VA Boston Healthcare System
Brockton VA Medical Center
940 Belmont Street, Brockton, MA, 02301
Health Care for Reentry Veterans

October 2, 2020

RE: Emory Gordon Snell Jr.

This letter is to confirm that Mr. Emory Snell Jr. is a United States Navy veteran who is eligible for services through the Department of Veterans Affairs (VA). He served in the United States Navy from January 1974 to May 1975 and received an Honorable discharge.

Based upon this eligibility status, Mr. Snell is eligible for healthcare and various programming through the Department of Veterans Affairs. These services and programs may include: acute inpatient care, residential treatment, transitional housing programs, outpatient mental health and substance abuse counseling, primary care, and other specialty care clinic services.

If Mr. Snell is granted a favorable determination at the time of his hearing with the Parole Board, Health Care for Re-entry Veterans (HCRV) staff from the VA will coordinate with correctional facility re-entry staff to conduct further evaluation to confirm re-entry/release planning needs.

The HCRV program is designed to promote success and prevent homelessness among veterans returning to the community after incarceration. HCRV services include (1) outreach and pre-release assessments services for veterans in jail/prison, (2) referrals and linkages to medical, mental health and social services, including employment services upon release, and (3) short-term case management assistance upon release.

Please feel free to contact me with any additional questions or concerns you may have with respect to the Health Care for Re-entry Veterans (HCRV) program or VA services/programs. I can be reached at 781-825-3816.

Sincerely,

Rachel Seed, LICSW
Veterans Justice Outreach/Healthcare for Reentry Veterans Coordinator





*The Commonwealth of Massachusetts*
*Executive Office of Public Safety & Security*
*Department of Correction*
*MCI Shirley*
*P.O. Box 1218*
*Shirley, MA 01464*
*Tel.: (978) 425-4341*
*www.mass.gov/doc*

**CHARLES D. BAKER**
*Governor*

**KARYN E. POLITO**
*Lieutenant Governor*

**THOMAS TURCO, III**
*Secretary*

**CAROL A. MICI**
*Commissioner*

**CHRISTOPHER M. FALLON**
**JENNIFER A. GAFFNEY**
**MICHAEL G. GRANT**
**PAUL J. HENDERSON**
**THOMAS J. PRESTON**
*Deputy Commissioners*

**MICHAEL RODRIGUES**
*Superintendent*

October 27, 2020

Emory Snell W59191
MCI Shirley/A-2
P.O. Box 1218
Shirley, MA 01464

Dear Mr. Snell,

Your correspondence to Commissioner Mici has been referred to me regarding an approved ADA reasonable accommodation from James O'Gara Department ADA Coordinator for inmates, to travel by state car. As noted in Mr. O'Gara's letter dated 11/6/2019, reasonable accommodation to travel by state car was due to an active "no stairs" medical restriction. This medical restriction expired on 11/8/2019.

Your medical restriction was reviewed by a medical provider on 11/13/19, and amended to "no stair climbing in housing unit." Based on this modification; an ADA Reasonable Accommodation for state car was not indicated.

If your medical condition changes or you choose to be reconsidered you must reapply for an ADA Reasonable Accommodation.

I trust this addresses your concerns.

Sincerely,

Michael Rodrigues
Superintendent

cc:  Comm. Log #40084
     file

MR/alr

26 June 2019


TO: Carlos Flores, Sr., NP
RE: Return of All KOP Medications


NP Flores:

   Respecting your prior request to contact you directly before communication with Dr. Angelis, I write today with a problem concerning my KOP medications.

   On 20 June 2019, I had approximately 11-KOP cards scanned, as well as, those (3) Asthma/COPD inhalers prescribed.  However, on 24 June 2019, my cell was randomly searched, and all those "empty" cards were confiscated.

   Moreover, I continue to be without medications, and when I go to the window, the nurse informs me that she has only (4) of the fifteen medications I am prescribed, two of those I believe have been discontinued, or replaced with new medications Ordered by you.

   In sum, I have family members advocating my complaints to various Public Administrators, and others with an interest in how this matter is handled.

   I close, hoping that you can provide me assistance, I am


Very Best Regards,




Emory G. Snell,Jr., W59191 / A2 #11B




/EGS
Cc: Lucas I. Silva, Esq.
    Richard J. Shea, Esq.

| CRIMINAL COMPLAINT | MIDDLESEX, ss. | 1 of 2 | District Court Department |
|---|---|---|---|

Ayer Dist. Court
25 E. Main str.
Ayer, Ma. 01432

I, the undersigned complainant, request that a criminal complaint issue against the accused charging the offense(s) listed below. If the accused HAS NOT BEEN ARRESTED and the charges involve:

☐ ONLY MISDEMEANOR(S), I request a hearing ☒ WITHOUT NOTICE because of an imminent threat of
  ☒ BODILY INJURY ☐ COMMISSION OF A CRIME ☐ FLIGHT ☐ WITH NOTICE to accused.
☒ ONE OR MORE FELONIES, I request a hearing ☒ WITHOUT NOTICE ☐ WITH NOTICE to accused.

☐ WARRANT is requested because prosecutor represents that accused may not appear unless arrested.

ARREST STATUS OF ACCUSED
☐ HAS  ☒ HAS NOT been arrested

### INFORMATION ABOUT ACCUSED

NAME (FIRST MI LAST) AND ADDRESS

Michelle L. LaFountain
MCI-Shir-Med.
P.O. Bx. 1218
1 Harvard Rd.
Shirley, Ma. 01464

| | |
|---|---|
| BIRTH DATE unknown | SOCIAL SECURITY NUMBER unknown |
| PCF NO. unknown | MARITAL STATUS unknown |
| DRIVERS LICENSE NO. unknown | STATE MA. |
| GENDER Female | HEIGHT 5'8" | WEIGHT 135 | EYES BRN |

| HAIR BLK | RACE WHT | COMPLEXION Fair | SCARS/MARKS/TATTOOS unknown | BIRTH STATE OR COUNTRY MA. | DAY PHONE (978)425-4341 |

EMPLOYER/SCHOOL Wellpath/CCS

MOTHER'S MAIDEN NAME (FIRST MI LAST) unknown

FATHER'S NAME (FIRST MI LAST) unknown

### CASE INFORMATION

COMPLAINANT NAME (FIRST MI LAST)
EMORY G. SNELL,JR.

COMPLAINANT TYPE
☐ POLICE ☒ CITIZEN ☐ OTHER

PD unknown

ADDRESS
1 Harvard Rd.
Shirley, Ma. 01464-1218

PLACE OF OFFENSE
MCI-Shir-Med  1 Harvard Rd.

INCIDENT REPORT NO. NONE | OBTN NONE

CITATION NO(S). NONE

| | OFFENSE CODE | DESCRIPTION | OFFENSE DATE |
|---|---|---|---|
| 1 | c.265, §13K(e) | Assault & Battery disabled person | 1 july 19 |

VARIABLES (e.g. victim name, controlled substance, type and value of property. other variable information; see Complaint Language Manual)
On that date, defendant refused to provide medications, causing towit, assualt/battery

| 2 | c.266, §30(5) | Larency under $250 (11-counts) person over sixty | 1 July 19 |

VARIABLES
defendant by unlawful means did steal (11)blister packs of meds valued under $250 from 60yr.old

| 3 | c.274, §7 | Conspiracy to commit larceny | 1 july 19 |

VARIABLES
defendant conspired w/Arsenault to steal dr. prescribed (11-blister packs) medications

REMARKS
Additional Offenses (Reverse Side)

COMPLAINANT'S SIGNATURE
X

DATE FILED
2 July 2019

COURT USE ONLY → A HEARING UPON THIS COMPLAINT APPLICATION WILL BE HELD AT THE ABOVE COURT ADDRESS ON
DATE OF HEARING  AT  TIME OF HEARING  | COURT USE ONLY

### PROCESSING OF NON-ARREST APPLICATION (COURT USE ONLY)   CLERK/JUDGE

| DATE | |
|---|---|
| | NOTICE SENT OF CLERK'S HEARING SCHEDULED ON: |
| | NOTICE SENT OF JUDGE'S HEARING SCHEDULED ON: |
| | HEARING CONTINUED TO: |
| | APPLICATION DECIDED WITHOUT NOTICE TO ACCUSED BECAUSE: |
| | ☐ IMMINENT THREAT OF ☐ BODILY INJURY ☐ CRIME ☐ FLIGHT BY ACCUSED |
| | ☐ FELONY CHARGED AND POLICE DO NOT REQUEST NOTICE |
| | ☐ FELONY CHARGED BY CIVILIAN; NO NOTICE AT CLERK'S DISCRETION |

### COMPLAINT TO ISSUE   COMPLAINT DENIED   CLERK/JUDGE

| DATE | COMPLAINT TO ISSUE | COMPLAINT DENIED |
|---|---|---|
| | ☐ PROBABLE CAUSE FOUND FOR ABOVE OFFENSE(S) NO(S). ☐ 1. ☐ 2. ☐ 3. BASED ON | ☐ NO PROBABLE CAUSE FOUND ☐ REQUEST OF COMPLAINANT |
| | ☐ FACTS SET FORTH IN ATTACHED STATEMENT(S) | ☐ FAILURE TO PROSECUTE |
| | ☐ TESTIMONY RECORDED: TAPE NO. | ☐ AGREEMENT OF BOTH PARTIES |
| | START NO. ____ END NO. ____ | ☐ OTHER: |
| | ☐ WARRANT ☐ SUMMONS TO ISSUE | COMMENT |
| | ARRAIGNMENT DATE: | |

| OFFENSE CODE | DESCRIPTION | OFFENSE DATE |
|---|---|---|
| #4 - c.265, §37 | Civil Rights Violation | 1 july 19 |

Variables - defendant's criminal intent to deprive complainant of life-saving chronic care critical heart; blood pressure; hypertension & other crucial medicals, did with said criminal intend, wantonly deny complainant of civil rights and immunities afforded by the Massachusetts and United States Constitutions.

| #5 - c.265, §43A | Criminal Harassment | 1 july 19 |
|---|---|---|

Variables - defendant's acts and omissions in that unlawful theft of doctor prescribed chronic care critical heart; blood pressure; hypertension; & other crucial life saving medications, under cloak of government authority, is w/o due process especially, through lack of any legitimate discretion, such telling for the exact purpose to use speech to intentionally inflict mental/physical duress.

| #6 - c.274, §4 | Accessory after the fact | 1 july 10 |
|---|---|---|

Variables - defendant after the 24 june 2019 unlawful theft, on 1 july 2019, after the fact, was expressly responsible for depriving complainant of life-saving chronic care critical heart; blood pressure; hypertension; pulmonary & other crucial doctor prescribed medications, and with such criminal intent to ascertain that any physical/mental duress would be intentionally inflicted with no regard to the distinct probability of death from those unlawful after the fact acts.

| #7 - c.265, §29 | Assault w/intent to commit a felony | 1 july 19 |
|---|---|---|

Variables - defendant acting after the fact, did with specific intent assault and commit a felony, towit, conspire w/Arsenault to steal complainant's chronic care - heart; blood pressure; hypertension; pulmonary & other crucial life-saving doctor ordered KOP medications. Further by depriving complainant of those aforesaid chronic care critical life-saving medications, defendant did with criminal intent commit a felony on complainant by such assault physically/ mentally, causing duress, from those underlying ##1-6 felony offenses.

| #8 - c.266, §30 | Larency | 1 july 19 |
|---|---|---|

Variables - defendant did with specific and wilfull intent steal 11 medical blister packs and did deprive complainant of those life-saving medications that were doctor prescribed. In so stealing that controlled medication, defendant intentionally and with criminal intent, did deprive, control, or convert such property to deny complainant those medications permanently. The collective value of those 11-medical blister packs exceeded $250 dollars.

| #9 - c.266, §51 | Embezzlement | 1 july 19 |
|---|---|---|

Variables - defendant while (1) in a position of trust or confidence that was entrusted with possession of personal property belonging to another person (2) took that property without consent of the owner (3) did so with specific intent to deprive complainant (owner) of that property (11-blister packs of medications) permanently, and in so doing, caused complainant to suffer mental/physical duress and chance of death.

| STATEMENT OF FACTS<br>IN SUPPORT OF<br>APPLICATION FOR CRIMINAL COMPLAINT | APPLICATION NO. *(court use only)* | PAGE<br>2 OF 2 | Trial Court of Massachusetts<br>District Court Department |
|---|---|---|---|

The undersigned alleges the following as a ☐ full or ☒ partial statement of the factual basis for the offense(s) for which a criminal complaint is sought.

COURT DIVISION
AYER DISTRICT COURT
25 E. Main Str.
Ayer, Ma. 01432

On 1 July 2019, complainant Emory G. Snell,Jr. ("Snell"), did seek the return of those ~~unlawfully stolen~~ doctor prescribed chronic care - critical blood pressure; heart; hypertension; pulmonary & other crucial life-saving medications. The defendant as detailed hereto, ##1-9, did with criminal intent, ~~after the fact~~, commit a felony, by barring Mr. Snell with those aforementioned life-saving medications. Defendant at the time of those hereinbefore described criminal offenses, did in fact, know that complainant was a person of sixty-threes, and that defendant was in a trusted position, whose duty it was to ascertain that complainant at all times was properly ~~possessing of doctor prescribed~~ mediciations. As detailed by those individual criminal offenses, defendant individually and in concert with Timothy J. Arsenault, did conspire to ~~deprive complainant of all those~~ life-saving medications, with reckless and callous disregard for complainant's health, and well-being, with such full knowledge that those ~~life-saving medications were prescribed~~ for serious and fatal medical conditions complainant has suffered for more than (2) decades. This criminal complaint is brought out of the ~~Emergency situation that now exists~~, under the imminent cause of death. Defendant was fully knowledgeable that complainant was over sixty-threes old, and her indifference ~~by stealing those life-saving medications~~ is prima facie evidence of that criminal intent to cause complainant serious and grievous bodily injury/harm. Unassailably, it is without any ~~doubt that the 11-medical blister packs were~~ specifically prescribed to the complainant, and therefore property of the complainant, as ~~evinced by complainants name appearing on each individual medical blister pack~~, and as such, each did not come into the possession of the defendant with such wilfull consent of the complainant. Penultimately, ~~defendant under contract to the Commonwealth of Massachusetts~~, and by such symbiotic relationship, was a de facto government employee, acting under the laws of the ~~Massachusetts Constitution, Statutes, and Regulations~~. Finally, at no time did complainant consent to the defendants' taking of his life-saving critical heart; blood ~~pressure; hypertension; pulmonary and other medications~~.

Signed, this 2nd day of July 2019 under pain and penalty of perjury.

*(Use additional sheets if necessary)*

| PRINTED NAME<br><br>Emory G. Snell,Jr. | SIGNATURE<br><br>X | I AM A:<br>☐ LAW ENFORCEMENT OFFICER<br>☒ CIVILIAN COMPLAINANT OR WITNESS | DATE SIGNED<br><br>2jul 19 |
|---|---|---|---|

ADDITIONAL FACTS FOUND BY CLERK-MAGISTRATE / ASST. CLERK / JUDGE BASED ON ORAL TESTIMONY

| REMARKS | SIGNATURE OF CLERK-MAGISTRATE / ASST.CLERK / JUDGE<br><br>X | | DATE SIGNED |
|---|---|---|---|

# EXHIBIT

## "B"



**CHARLES D. BAKER**
*Governor*

**KARYN E. POLITO**
*Lieutenant Governor*

**THOMAS A. TURCO III**
*Secretary*

*The Commonwealth of Massachusetts*
*Executive Office of Public Safety & Security*
*Department of Correction*
*50 Maple Street, Suite 3*
*Milford, MA 01757*
*Tel: (508) 422-3300*
*www.mass.gov/doc*



**CAROL A. MICI**
*Commissioner*

**JOHN A. O'MALLEY**
*Chief of Staff*

**CHRISTOPHER M. FALLON**
**JENNIFER A. GAFFNEY**
**MICHAEL G. GRANT**
**PAUL J. HENDERSON**
**THOMAS J. PRESTON**
*Deputy Commissioners*

November 6, 2019

Mr. Emory Snell #W59191
MCI Shirley

RE: Appeal from Denial of Request for Reasonable Accommodation

Dear Mr. Snell:

I am in receipt of your Appeal from Denial of Request for Reasonable Accommodation that was received in my office on September 17, 2019. I have thoroughly reviewed your appeal and the request for a reasonable accommodation to have alternative transportation via a state car and posey leg restraints due to your reported osteoarthritis in both knees. I personally met with you on October 4, 2019 to discuss your request for reasonable accommodation. At that meeting you indicated that the Health Services Unit at MCI Shirley had authorized you to have an approved medical restriction for soft posey leg restraints. You also provided an active medical restriction for "no stair climbing" that is currently effective from November 8, 2018 to November 8, 2019. I have consulted with Ms. Michelle LaFountain, RN, MSN, Health Services Administrator, Wellpath, at MCI Shirley to determine if you have been assessed for your reported impairment by the Medical Provider and if there was an active medical restriction for "no stair climbing". It has been confirmed that you have an active "no stair climbing" medical restriction that expires on November 8, 2019. Based upon the active medical restriction for "no stair climbing" you will be granted a reasonable accommodation of alternative transportation via a state car if you need to be transported out of the facility. This reasonable accommodation for alternative transportation via state car will be effective up until November 8, 2019 at which time your medical status will again be reviewed by the Medical Provider at MCI Shirley to determine if your physical impairment requires the continuation of a "no stair climbing" order. Your request for a soft posey restraint is granted as a medical restriction and is effective from September 10, 2019 to September 4, 2020. If you require additional medical evaluations please submit a medical sick call request to the Health Services Unit at MCI Shirley where your request will be reviewed and responded to appropriately.

Based upon the totality of information and documentation I was able to review regarding your appeal, your request for a reasonable accommodation for alternative transportation via a state car for outside transportation is granted at this time. My review concluded that you have an active "no stair climbing" medical restriction that is active from November 8, 2018 to November 8, 2019. I am requesting the Medical Provider to review and assess your current medical condition and to make a determination if the "no stair climbing" restriction will be extended beyond the November 8, 2019 expiration date. The Health Services Unit will notify you of this review and assessment. Also, you have been granted an approved reasonable accommodation of soft posey restraints as a medical restriction effective from September 10, 2019 to September 4, 2020.

If you have any further questions regarding your granted reasonable accommodation request, please send me a written correspondence in order that I can address your concerns. All correspondence can be sent to my attention at 50 Maple Street, Milford, MA 01757.

Sincerely,

James M. O'Gara Jr.
Department ADA Coordinator for Inmates
Health Services Division

Cc: Ms. Suzanne Thibault, Superintendent, MCI Shirley
Mr. Kelly Hastings, Deputy Superintendent of Reentry (Institution ADA Coordinator), MCI Shirley
Ms. Michele LaFountain, R.N., Health Service Administrator, Wellpath, MCI Shirley
File

**Massachusetts Department of Correction**
**Health Services**
**MEDICAL RESTRICTIONS**

Institution _____

Name: _Snell Emory_  ID#: _W59191_  D.O.B.: _4/25/56_

Date: _11/8/18_

_____
DOC Designee

_____
Signed Receipt

The above named inmate has been determined to have the following needs/restrictions due to a current medical condition:

| TYPE: | DATE | TO |
|-------|------|-----|
| NO WORK STATUS | | |
| LIGHT WORK STATUS | | |
| NO JOGGING/SPORTS | | |
| NO WEIGHTLIFTING | | _11/8/19_ |
| BOTTOM BUNK | _11/8/18_ | _4/8/19_ |
| No Bot Shoes Size _12EEE—11/8/18_ | | |
| SPECIAL EQUIPMENT (DESCRIBE BELOW) | | |
| _1st Floor Housing_ | _11/8/18_ | _11/8/19_ |
| _Extra Food Trays_ | _11/8/18_ | _11/8/19_ |
| OTHER (DESCRIBE BELOW) | | |
| _No Stair Climbing_ | _11/8/18_ | _11/8/19_ |
| _Right Single Cell cuffs_ | _11/8/18_ | _11/8/18_ |
| TRANSPORTATION RESTRICTIONS: | | |
| NO WAISTCHAINS | | |
| NO HANDCUFFS | | |
| NO ANKLE RESTRAINTS | | |
| WAISTCHAINS WITH (CIRCLE) | | |
| RIGHT OR LEFT EXTENSION | | |
| STATE CAR | | |
| WHEELCHAIR VAN | | |

MEDICAL REASON:
_Severe Osteoarthritis Both Knees_

SUBMITTED BY: _James Churchill_  DATE: _11/8/18_  TIME: _10_
Provider

REVIEWED BY: _Therese Imes RN MSN_  DATE: _11/8/18_  TIME: _13.55_
Clinical Administrator

EXHIBIT

35

3-5-19 EV

(ORIGINAL IN MEDICAL RECORD AFTER APPROVAL)
(COPY TO D.O.C. DESIGNEE)

6322 Rev. 102011

Renewal

DOC 013010

3 February 2020                           EMORY G. SNELL, JR.
                                          1 Harvard Rd.
                                          Shirley, Ma. 01464-1218

Steven Descoteaux, MD
Wellpath/CSS
Suite 250
16 Chestnut Str.
Foxborough, Ma. 02035

Re: 29 May 2019 - LSH "Dilated Aorta"

Dear Dr. Descoteaux:

    Recently received LSH medical records of 29 May 2019, detail
that among other things, Dr. John Cadigan, a heart specialist,
diagnosed me with a "dilated aorta." See, Assessment p.2.

    Accordingly, when I was returned to MCI-Shir-Med., that same
day, neither Carlos Flores, or Maria Angeles, brought this to my
attention, or made any recommendations as to treatment.  In fact,
a mere 5-days later, I was rushed by ambulance to UMASS Memorial
Leominster, and diagnosed with "Pneumonia." See, Attachments.

    Dr. Cadigan further diagnosed that "...[I]t is extremely
important to treat his blood pressure.  I would up-titrate his
losartan, following his BUN and creatinine.  He may require
additional medication.  As he is said to be intermittently
asthmatic, he may not tolerate beta blockers. ..." id.

    Suffice it to say, nothing has been done to follow up on Dr.
Cadigan's specialized recommendations, hence, my writing to you,
in that capacity as Wellpath/CCS medical director.  Additionally,
Emil Petria a year ago, complained of chest pain, and when your
Shirley Medical Staff ignored his complaints, shortly after
returning from LSH, he died of a heart attack.  I do not expect to
end up dead because of medical malfeasance.

    I close, enclosing those LSH medical records, and anticipate
your direct intervention, and prompt treatment in accord with Dr.
Cadigan's specialized recommendations.  I am

Truly,

Emory G. Snell, Jr., W59191

/EGS
Cc: lucas I. Silva, Esq.
encls. LSH medical records

# ⊕ wellpath

3/2/20

TO: Emory Snell, Jr. W59191
    MCI Shirley

Mr. Snell,

Thank you for your letter and for including the recommendations from Dr. Cadigan. We will make sure you get the one (1) year follow-up ECHO cardiogram by June 2020. I also learned that there had been an issue regarding KOP medications that has since been resolved with DOC. I agree that blood pressure control is of utmost importance.

Respectfully,
Dr. Steven Descoteaux, MD
Statewide Medical Director

# EXHIBIT
# "C"

2 November 2020

EMORY G. SNELL, JR.
1 Harvard Rd.
Shirley, Ma. 01464-1218

Division of Health Professions Licensure
c/o Complai.nts
239 Causeway Str.
Boston, Ma. 02114

Re: Medical Malpractice / Imminent Death

To Whom It May Concern:

Presently, I am unconstitutionally imprisoned as an Actual Innocent.  That false
imprisonment causes me to suffer irreparable medical malpractice at the hands of:
(1) Carlos Flores,Sr. NP, and (2) Michelle LaFountain,RN, who are employed by
Wellpath/CCS, Suite 250, 16 Chestnut Str., Foxborough, Ma. 02035, under the
supervision of Wellpath Medical Director, Steven Descoteaux,MD.

My complaint is, that on or about 1998, I was issued for an Indefinite period, a
"Special Medical Needs Restriction" for "difficulty climbing stairs," due to severe
DJD/OA.  On 8 Nov. 2018, Dr. Lawrence Churchville, a physician with more than 4-decades
of medical practice, issued a "No Stairs Climbing" special medical needs restriction,
but was allegedly constrained to do so for one-year.  On or about 11/12 Nov. 2018, upon
medical evaluation by Carlos Flores,Sr., NP., Flores remarked: "I see no need for that
[No Stair Climbing] Order."

On or about 6 Nov. 2019, Dep't of Correction (DOC) ADA coordinator James O'Gara, issued
a reasonable accommodation for "car" transport, due specifically, because of the 'No
Stair Climbing' Order.  However, true to his word, on or about 19 Nov. 2019, Flores,
without (a) physical examination; (b) MRI; or (c) CAT scan modified Dr. Churchville's
8 Nov. 2018 Order, to restrict me to 'No Stair Climbing in the housing unit.' I am
not aware of Flores orthopedic skills, experience and knowledge, but on 22 March 2019,
received a written evaluation from orthopedic surgeon, Michael G. Kennedy,MD,PC,FRCS(C),
of 6 Union Str., Natick, Ma. 01760 (508)655-5115, where he applied his special orthopedic
skill, knowledge and experience, finding that without a No Stairs Climbing restriction,
"...[A]ny significant stress placed across the patellofemoral joint in ascending and
descending stairs puts Mr. snell in danger of falling. ..." (emphasis added).

Additionally, 4/12/19, John Cadigan,MD, a cardiologist by Echocardiogram found that both
my (a) aorta is dilated, and (b) my ascending root has progressed beyond their respective
upper limits.  Dr. Cadigan Ordered a follow up in a year (June 2020).  However, due to
that gross negligence/medical malpractice of Flores, the ADA 'car' transport was revoked,
and two follow ups were denied in Aug. 2020, and on 9 Oct. 2020.  The seriousness of
my cardiac condition cannot be understated, recommendations for elective surgery at this
stage is highly recommended to extend mortality.  See, Surgical Treatment of the Dilated
Ascending Aorta: When and How?  M. Arisan Ergin,MD; 1999 The Society of Thoracic Surgeons.

Div. of Health Professions Licensure; c/o complaints
2 Nov. 2020 - pg.2
Re: Medical Malpractice / Imminent Death


In sum, directly attributable to Carlos Flores,Sr., I am in fear of imminent death,
should my dilated aorta rupture.  "there is very little doubt that the occurrance of
rupture or dissection is a catastrophic event that changes the natural history of a
dilated ascending arota dramatically.  Rupture uniformly, and dissection in the vast
majority of the patients is <u>fatal</u> without urgent surgical treatment, which carries a
substantially higher risk than elective surgery.  Even if the patient survives the
acute incident as the result of a successful operation or proceeds into the chronic
phase of the dissection, he will remain at higher risk for distal aorta-related
complications, which are the most important determinants of long-term survival in
most cases. ..." Ergin, et al. (emphasis added).

Accordingly, I make this complaint on Carlos Flores,Sr., arising from his gross negligence,
&/or medical practice, which has placed my health and mortality in imminent jeopardy,
by aorta rupture, when it is his sworn responsibility to "Do No Harm."

I close, expecting a thorough investigation, and have enclosed significant medical
documentation to underscore my claims.  Of course, should further documentation be
required, please contact me, so I may correspond with Lucas I. Silva, Esq. of Foley
Lardner LLP of Boston.  Attorney Silva has thousands of medical documents at his
disposal, and will gladly assist me in prosecuting Flores reckless and callous
disregard for my health, safety and well being.  I thank you in advance, I am


Sincerely,



Emory G. Snell,Jr.



/EGS
CC: Lucas I. Silva, Esq.
encls.